IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY D. VICKROY, | ) | Case No. 4:22-CV-2117 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Jeffrey D. Vickroy, seeks judicial review of the final decision of the
Commissioner of Social Security, which denied his applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security
Act.  Vickroy challenges the Administrative Law Judge's ("ALJ") negative findings, contending
that the ALJ erred in: (i) failing to include his upper extremity numbness as a severe impairment,
(ii) evaluating his subjective symptoms complaints, and (iii) finding that he had the residual
functional capacity ("RFC") to perform medium-level work.  Because the ALJ applied proper
legal standards and reached a decision supported by substantial evidence, I recommend that the
Commissioner's final decision denying Vickroy's applications for DIB and SSI be affirmed.

I.      **Procedural History**

Vickroy applied for DIB and SSI on August 21, 2020.  (Tr. 255-270).[1]  He alleged that he
became disabled on August 9, 2020 due to: (i) post-traumatic stress disorder ("PTSD"),

---

[1] The administrative record appears in ECF Doc. 6.

(ii) chronic obstructive pulmonary disease ("COPD"), (iii) asthma, (iv) "bad knees,"

(v) "wedging of back," (vi) obstructive sleep apnea ("OSA"), (vii) agoraphobia, (viii) social

anxiety, (ix) bipolar disorder, (x) narcissism, (xi) diabetes, (xii) high blood pressure,

(xiii) antisocial personality disorder, (xiv) arthritis, (xv) headaches, (xvi) numbness in his left

hand and arm, and (xvii) high cholesterol.  (Tr. 285, 293).  The Social Security Administration

denied Vickroy's applications initially and upon reconsideration.  (Tr. 96-104, 116-125).

Vickroy requested an administrative hearing.  (Tr. 181-182).

On October 13, 2021, ALJ Karen Kostol heard Vickroy's case telephonically and denied

his applications in a December 6, 2021 decision.  (Tr. 17-31, 37-95).  In so ruling, the ALJ

determined that Vickroy had the RFC to perform medium level work, except that:

> [Vickroy] can occasionally climb ladders, ropes, scaffolds, ramps, or stairs.  He can
> occasionally kneel and crawl.  He must avoid concentrated exposure to extreme
> cold, extreme heat, wetness, or humidity and irritants such as fumes, odors, dust
> and gases, poorly ventilated areas, and chemicals.  He is capable of no more than
> frequent handling with the left upper extremity.  He is capable of simple, routine,
> and repetitive tasks.  He is capable of no interaction with the general public and
> occasional interaction with co-workers and supervisors such that the claimant is
> capable of working with things rather than with people.

(Tr. 23).

On September 23, 2022, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1-3).  On November 22, 2022, Vickroy

filed a complaint for judicial review.[2]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Vickroy was born on June 17, 1967; he was 53 years old on the alleged onset date.

(Tr. 329).  He completed high school and had previously worked as a corrections officer and as a

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

maintenance worker.  (Tr. 287).  The ALJ determined, however, that Vickroy could not perform
any past relevant work.  (Tr. 29).

### B.    Relevant Medical Evidence

On September 16, 2019, Vickroy was seen at the Veterans' Affairs Clinic by
psychologist Samantha Ross.  (Tr. 438-439).  Vickroy indicated that, over the preceding two
weeks, on more than half of the days he'd had trouble falling or staying asleep or sleeping too
much, and several days he felt tired or had little energy.  (Tr. 439).  For several days, he had
trouble concentrating.  *Id.*  Based on these responses, Ross indicated that Vickroy had "minimal"
depression, between 1-4 on a 0 – 27 scale.  (Tr. 438-439).

On November 10, 2019, Vickroy was seen at East Liverpool City Hospital and underwent
x-rays of his spine.  (Tr. 380, 383, 388).  Vickroy reported having had right-side lower back pain
for the preceding five days, as well as numbness and tingling of his right leg and pain in his hip
for a week.  (Tr. 383)*.*  He also noted pain "radiating into his right extremity," but denied any
lower extremity weakness, numbness, or tingling.  *Id.*  Vickroy indicated he'd fallen a month
prior, but the steroids and muscle relaxants he'd taken failed to provide relief.  *Id.*  A review of
Vickroy's systems was unremarkable.  *Id.*  Vickroy's physical examination was also, largely
unremarkable, save for a notation that he had a "[r]ight paralumbar increased muscle mass with
tenderness."  (Tr. 385-386).  The x-rays indicated that Vickroy was not injured but had mild
osteoarthritis of some disc spaces that "may cause foraminal stenosis," but no other degenerative
abnormalities.  (Tr. 380).  Following medication, Vickroy reported his pain had partly resolved,
and he was discharged in stable condition.  (Tr. 386).

On December 5, 2019; January 9, 2020; and March 11, 2020; Vickroy had additional
appointments with Ross.  (Tr. 434-438).  While Vickroy's other depression symptoms fluctuated,

he consistently reported having trouble sleeping more than half the days during a two-week

period, as well as that he had a poor appetite or overate nearly every day and had trouble

concentrating.  *Id.*  Each time, Ross concluded Vickroy had "minimal" depression.  *Id.*

On March 12, 2020, Vickroy had imaging taken of his chest, due to a chronic cough.

(Tr. 542).  The imaging noted that there was "mild degenerative change with minimal vertebral

wedging" in his spine, and his heart was in the upper normal range in size, but he had no

congestion.  (Tr. 543).  He also had imaging taken of his knees, which indicated "[d]egenerative

change" and right-side soft tissue swelling.  (Tr. 543-544).

On April 27, 2020, Vickroy messaged the VA and reported that his back was getting

better, he had a new brace for his right knee that helped, and his new inhaler helped.  (Tr. 530).

On June 18, 2020, Vickroy saw Timothy Domer, D.O.  (Tr. 369).  On physical

examination, Dr. Domer observed that Vickroy's legs did now show any acute skin changes, but

he had a large eczematic-type rash over his upper leg and knee.  *Id.*  Dr. Domer noted a moderate

joint line in both knees at the medial, but no significant soft tissue or lateral knee pain, and no

instability.  *Id.*  Dr. Domer also reviewed x-rays of Vickroy's pelvis and knees, which indicated

chronic bilateral leg and knee pain, along with osteoarthritis in his knees.  (Tr. 369, 370-372).

Dr. Domer's impression was that Vickroy had bilateral knee pain and osteoarthritis.  (Tr. 369).

Dr. Domer and Vickroy discussed non-surgical treatments, and Dr. Domer recommended

physical therapy and medication, which Vickroy accepted.  *Id.*  They also discussed steroid

injections, which Dr. Domer then gave Vickroy in both knees.  *Id.*

On June 22, 2020, Vickroy returned to the emergency room.  (Tr. 390).  Vickroy reported

that he felt like he'd had heat stroke the day before and that morning he still was not feeling well;

he had concerns over COVID-19.  (Tr. 392).  The day prior, he explained, he felt that his blood

pressure was increasing and, when he called the VA clinic, they told him to go to the emergency room.  *Id.*  A review of Vickroy's systems and his physical examination were unremarkable. (Tr. 392, 395).  The impression was that Vickroy was primarily stressed from work, and his hypertension was secondary.  (Tr. 398).  He was discharged in stable condition.  *Id.*

On June 24, 2020, Vickroy followed-up with the VA clinic after his ER visit.  (Tr. 519). A review of his systems and review of his physical condition were unremarkable.  (Tr. 521).

On June 29, 2020, Vickroy messaged the VA, inquiring about whether the VA would cover appointments with a chiropractor for physical therapy, for which the VA said they would provide him with a referral.  (Tr. 512).

On July 17, 2020, Vickroy was seen at the East Liverpool hospital.  (Tr. 503).  Vickroy reported leaving work a few days prior due to "heat exhaustion" but that he was "feeling fine." And his wife reported that, "Today he feels fine."  (Tr. 504). He was assessed with dehydration. (Tr. 505).

On November 6, 2020, Vickroy had a telehealth visit with the VA for management of his chronic conditions.  (Tr. 633).  A review of his systems was unremarkable.  (Tr. 634).  Vickroy was assessed with hypertension, hyperlipidemia, OSA, diabetes, cardiomyopathy, COPD, and bilateral knee pain.  *Id.*  Vickroy's chronic pain was discussed, and he was offered physical therapy and referred for injections; Vickroy stated that he did not want to leave home; he did not want to follow with treatment through VA Mental Health, but had "a guy" he'd seen in the private sector; and he was "starting his own PT at home."  *Id.*

On May 14, 2021, Vickroy, through the VA's medical messaging service, indicated he had just left "the most abusive relationship believable," noting various forms of abuse from his wife.  (Tr. 624).  But he indicated he only had anxiety; he was not homicidal or suicidal.  *Id.*  He

stated that he would only do counseling with Julie Sattler, and he would not go back on medication.  *Id.*  He indicated that his friend, Charnette Sellers, had his power of attorney and the VA should contact her – not him.  (Tr. 625).

On June 9, 2021, Vickroy had a psychiatrist telephone session with Robin Kay See, LISW.  (Tr. 620, 622).  See's treatment notes indicated that Vickroy had previously been diagnosed with a panic disorder with agoraphobia and narcissistic personality disorder.  *Id.*  See indicated that Vickroy had called while the sheriff's office was at his home to remove his wife's personal belongings, after a protection order was issued on her behalf.  (Tr. 620-621).  Once the police left, Vickroy spoke about his abusive relationship with his wife.  *Id.*  He also explained that his friend Charnette was just a friend, and he had a girlfriend.  *Id.*  Vickroy said he wanted to go back to therapy for his anxiety and that, due to his agoraphobia, he did not want to leave his home.  (Tr. 622).  He repeated that he was not in distress, just anxious, and he stayed home and plays video games.  *Id.*

On July 6, 2021, Vickroy was seen by Nurse Practitioner Julie Sattler for mental health counseling.  (Tr. 608, 613).  Charnette attended the session with Vickroy.  (Tr. 608).  Vickroy discussed bringing a woman from overseas to the United States to "save her from oppression" and noted he would probable marry her.  (Tr. 608-609).  Vickroy spoke about his abusive relationship with his wife and believed that his social anxiety caused him to not be around people and dislike leaving his home.  (Tr. 609-610).  Vickroy reported wanting to go back to therapy and get a tablet so he could do video appointments.  (Tr. 609).  He said he did not feel angry as a general mood; he did not want to hurt anyone or himself; and he would get overwhelmed by his anxiety at times.  *Id.*

Sattler conducted a mental status exam, observing that Vickroy was fully oriented, cooperative, and appropriately groomed; Vickroy had very high anxiety, rapid speech at times of high anxiety, an anxious mood, depression due to recent stress, a congruent affect, a logical and linear thought process, normal thought content, and intact memory.  *Id.*  A review of his systems and physical examination were unremarkable.  (Tr. 611-613).  Sattler also screened Vickroy for depression.  (Tr. 615-616).  Vickroy indicated that nearly every day he had little interest or pleasure in doing things and felt, down, depressed, or hopeless.  *Id.*  She assessed Vickroy with hypertension and "PTSD/Depression/Personality Disorder."  (Tr. 613).

On July 22, 2021, Vickroy saw Pamela Zalewski, with the VA, regarding his mental health.  (Tr. 598-599).  Vickroy reported that he "just doesn't like people" and spoke about his soon-to-be ex-wife, whom he asserted was abusive and socially isolated him.  (Tr. 599).  He indicated she would frequently threaten suicide and had made an attempt.  *Id.*  He had an order that prevented her from coming near him.  *Id.*  Zalewski noted Vickroy frequently referred back to his childhood abuse, including instances of gross sexual abuse, and spoke about the VA being unhelpful and disagreeing with their diagnosis.  *Id.*  Zalewski also noted redirecting Vickroy to the purpose of their visit, to which he indicated he wanted medication for his anxiety, particularly benzodiazepine or, if unavailable, marijuana.  (Tr. 600).  Zalewski educated Vickroy on the negative consequences of each, informed Vickroy he would not receive marijuana from the VA clinic, advised him to avoid marijuana, and recommended a different medication, which he refused.  *Id.*  A review of his systems was largely unremarkable, save for what was previously discussed.  (Tr. 601).

Zalewski also conducted a mental status examination and observed that Vickroy was fully oriented, at time agitated, and guarded; and he had limited grooming and hygiene, normal

speech, grossly intact cognition, and tangential thought process.  *Id.*  She noted that Vickroy's thought content was focused on his childhood trauma, dismissive of his prescribed medication, and "reframe[ed] situations with the VA [so] that he is the victim."  *Id.*  Zalewski indicated that Vickroy's mood was severely irritable, he had an irritable affect, as well as poor judgment and insight.  *Id.*  She noted that it was unclear if Vickroy was an accurate historian.  *Id.*  Zalewski diagnosed Vickroy with PTSD.  (Tr. 604).  Vickroy had an interest in therapy, but he did not call to confirm with the VA and blamed the VA for preventing him from starting therapy.  *Id.*

    **C.**    **Relevant Opinion Evidence**

        **1.**    **Mental Status Evaluation – Andrea VanEstenberg, Ph.D., September 21, 2020**

On September 21, 2020, Vickroy underwent a mental status evaluation with Andrea VanEstenberg, Ph.D.  (Tr. 466).  Vickroy reported a history of mental health issues and verbal abuse by his father and both of his ex-wives, as well as various physical ailments.  (Tr. 466-467). He noted being diagnosed with PTSD and having participated in outpatient counseling, going every 2 months for the preceding 6 months.  (Tr. 468).  Regarding his day-to-day life, Vickroy reported fatigue, tingling in his arms, welding, painting, playing video games, and doing a "little hunting" and "tinkering," but noting that he could not do anything for long.  *Id.*

Dr. VanEstenberg conducted a mental status examination and observed the following. (Tr. 468-472).  Vickroy was appropriately dressed, cooperative, pleasant, and appropriate. (Tr. 468).  He had normal speech and described his mood as "okay."  *Id.*  As to his history of depression, Vickroy indicated he had sleep issues, struggled to remember things, and was absent minded, socially isolated, and withdrawn.  (Tr. 468-469).  He also had a history of anxiety, stress, agoraphobia.  (Tr. 469).  Dr. VanEstenberg observed that Vickroy's mental content was normal, logical, appropriate, and insightful; and Vickroy was fully oriented, of average

intellectual ability, and had adequate insight and judgment . (Tr. 469-470).  Dr. VanEstenberg concluded that Vickroy had generalized anxiety disorder and PTSD.  (Tr. 470).

Functionally, Dr. VanEstenberg concluded that Vickroy could comprehend and complete simple, routine tasks, but as the tasks became more complex in structure and demand, he "may experience more difficulty with extended ability with understanding directions, remembering and following instructions." (Tr. 471).  She did not think his level of cognitive functioning hampered his ability to understand and follow basic directives and routines.  *Id.*  Dr. VanEstenberg also concluded that Vickroy did not appear to have limitations in maintaining his attention, concentration, persistence, or pace; to perform simple tasks or to perform multi-step tasks.  *Id.* Based on Vickroy's self-reported issues in interacting with others, Dr. VanEstenberg noted Vickroy may "make a socially relian[t] position difficult" but he was socially unremarkable in the office.  *Id.*  Dr. VanEstenberg also found that Vickroy "would not appear limited in his ability to respond to typical work stressors, as he would perform well with a more socially isolated position and performing a single-step highly repetitive task." (Tr. 471-472).

### 2.     Mental Status Evaluation – Andrea VanEstenberg, Ph.D., January 11, 2021

On January 11, 2021, Vickroy saw Dr. VanEstenberg again for an evaluation.  (Tr. 548). His reported history and conditions were, generally, the same as the prior visit.  (Tr. 548-550). He, however, indicated that he was receiving outpatient behavioral services and noted that, after about 7 to 10 minutes, he would lose concentration.  (Tr. 550).  Dr. VanEstenberg's mental status examination observations were largely unchanged.  (Tr. 550-552).  However, Vickroy described his mood as anxious and that he used chewing tobacco to calm himself.  (Tr. 550). Dr. VanEstenberg's functional assessment was also, largely, unchanged.  (Tr. 553-554). Dr. VanEstenberg concluded that Vickroy had PTSD.  (Tr. 552).

### 3.      State Disability Authority Physical Evaluation

On March 17, 2021, Vickroy was seen by Inna Krasnyansky, M.D., for a physical examination on behalf of the state disability authority.  (Tr. 557).  A review of Vickroy's systems was positive for malaise/fatigue, hearing loss, tinnitus, a cough, shortness of breath, depression, memory loss, suicidal ideas, and it was noted that Vickroy was "nervous/anxious." (Tr. 558-559).  His physical examination results were unremarkable, except for notations that he appeared unhealthy, and his mood appeared anxious.  (Tr. 559-560).  Mobility and muscle examinations were also unremarkable.  (Tr. 561-565).  Dr. Krasnyansky reviewed the results of a pulmonary function test, which indicated that Vickroy had a mild obstructive ventilatory defect. (Tr. 566-573).  Dr. Krasnyansky's impression was that Vickroy had COPD, hypertension, depression, anxiety, and PTSD.  (Tr. 560).  Her opinion was that Vickroy was not limited in his physical abilities.  *Id.*

### 4.      Function Report – Jeffrey Vickroy

On September 7, 2020, Vickroy completed a function report.  (Tr. 314-321).  Vickroy reported that he could not stand, walk, or bend for long periods of time because of his knee pain; felt anxious whenever he left his house; and had trouble breathing when doing normal things like mowing the yard.  (Tr. 314).  Vickroy described his day as waking up, using the restroom, getting a drink or eating, playing videogames, talking with his wife, and then going back to bed when he was tired.  (Tr. 315).  Before his condition, he was able to mow the grass, feed the animals, make dinner, and remember to do normal activities.  *Id.*  His conditions affected his sleep because, with his PTSD, he "die[d] every night," and then work up tired and cranky.  *Id.* He indicated that he would forget if he had showered, and his wife would remind him every day to take his pills.  (Tr. 315-316).  He did not prepare meals because of his absentmindedness, so

his wife did the cooking.  (Tr. 316).  His wife also did the house and yard work because his knee and back pain were too severe, and he would forget or become easily distracted.  *Id.*

Vickroy indicated that he would go outside a couple of times a day with his dogs. (Tr. 317).  He would ride in a car and could drive, but he would get anxiety and agoraphobic if he went out alone.  *Id.*  He shopped by computer, purchasing items for his videogames; his wife did the other shopping.  *Id.*  He did not shop that much because he did not like to be around people.  *Id.*  His hobbies included playing videogames and listening to music.  (Tr. 318). Because of his conditions, he indicated he lacked the energy to do anything; his knees and back hurt too much to stand or walk very far, and he used to make things out of steel, but he no longer did.  *Id.*  He would spend time with others through his videogames, which he played for several hours.  *Id.*  He needed reminders to go places, and his wife would drive him to appointments, which was about the only time he left the house.  *Id.*

Vickroy indicated he had trouble getting along with friends and family and with social activities, indicating his family fought and he did not want to be around others or leave his house.  *Id.*  Physically, his conditions also affected his ability to: lift, squat, bend, stand, reach, walk, kneel, climb stairs, remember, complete tasks, concentrate, and use his hands.  (Tr. 319). He noted that his knees were at a constant 9-10 in pain.  *Id.*  He thought he could walk about 10 feet or less before needing to rest for about 30 minutes, could pay attention for a few minutes at a time, and could follow written instructions well but forgot spoken instructions.  *Id.*  He generally got along with authority figures, except for his last position when he was being harassed.  *Id.* Stress caused him extreme anxiety and he could handle changes in his routine, so long as it was not a lot of change.  (Tr. 320).  He thought his fear of leaving his house was unusual.  *Id.*

### 5.    Function Report – Charnette Sellers

On October 6, 2021, Charnette Sellers, a friend of Vickroy's who had known him for 30 years or more, completed a function report.  (Tr. 360-367).  Sellers indicated Vickroy had difficulty focusing, remembering, completing tasks, walking or standing too long, gripping and holding things, breathing when it was too hot/cold or during physical activities, talking on the phone, and leaving his house.  (Tr. 360).  She described his general day, if his PTSD and anxiety were bad, as playing video games or sleeping.  (Tr. 361).  If he was okay, he would shower, have coffee, feed his dogs, draw, and work on things in his garage.  *Id.*  She noted he mainly hung out with her and talked, and she would remind him of projects he was working on, so he could finish them.  *Id.*  She indicated Vickroy did not care for anyone else except his animals, whom he fed. *Id.*  She would help him take the animals to the vet, make sure they were fed and watered, give them medication, and pick up dog food.  *Id.*  Before his conditions, Vickroy was able to lift and hold heavy things, drive alone, go out in public, have people over, work outside in the heat or cold, and talk to people on the phone.  *Id.*  His conditions caused him to have nightmares and terrors, causing restless sleep, short sleep patterns, and napping.  *Id.*

Sellers indicated that Vickroy needed to be reminded to shower, feed himself, and to take his medication; otherwise, he could care for himself.  *Id.*  Vickroy could make his own meals, if they were simple because otherwise, he would become distracted and burn the food.  (Tr. 362). He would prepare his own meals daily, and it usually took him about 30 minutes.  *Id.* Previously, Vickroy would cook full healthy meals and was able to stand at the stove for more than 10-15 minutes.  *Id.*  Vickroy would do his own laundry, dishes, cleaning the shower, and mowing, but would only do so when he needed to, she reminded him, or, in the case of mowing,

when he was using a riding mower.  *Id.*  Vickroy would not do such chores as weed-whacking because it was painful.  (Tr. 363).

Sellers noted that Vickroy would do yard work, but he did not go elsewhere because of anxiety/panic attacks, which caused high blood pressure.  *Id.*  Vickroy could drive car but did not go out alone because of anxiety/panic attacks.  *Id.*  He would shop online or by mail and did not go shopping in public.  *Id.*  Vickroy's interest and hobbies were videogames, "crossput", and art.  (Tr. 364).  He would play videogames daily and did art when he was not stressed or anxious.  *Id.*  But she noted he had stopped drawing and doing artistic projects when his conditions began.  *Id.*  Vickroy spent time with others when playing videogames or texting, which was about once or twice a day.  *Id.*  He did not go anywhere regularly and would need to be reminded of appointments.  *Id.*  Vickroy had problems getting along with others, he did not have friends or family over, and he did not like groups or crowds.  (Tr. 365).

Sellers indicated that Vickroy's conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, talk, hear, climb stairs, remember things, complete tasks, concentrate, use his hands, and get along with others.  *Id.*  She estimated that he could walk 15 yards before needing to rest for 10 to 15 minutes and he could pay attention for 10-20 minutes.  *Id.*  Vickroy did not finish what he started.  *Id.*  He could follow written and spoken instructions as long as they were short and to the point.  *Id.*  He did not get along with authority figures well, and he had been fired for problems getting along with others, which she indicated was because he finds workplace dynamics a distraction and just wants to do his job and be left alone.  (Tr. 366).  He did not handle stress well, resulting in anxiety/panic attacks, and high blood pressure, and he did not handle changes in his routine well.  *Id.*

### 6.    State Agency Consultants

#### a.    Physical Health Consultants

On September 23, 2020, Gerald Kylop,[3] reviewed the medical evidence of Vickroy's physical limitations.  (Tr. 101-102).  He concluded that Vickroy was limited to occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, could stand and/or walk 6 hours in an 8-hour workday; could sit for 6 hours in an 8-hour work day; and could occasionally climb ramps, climb ladders, stoop, kneel, crouch, and crawl.  (Tr. 101). Otherwise, Vickroy was unlimited in his abilities.  *Id.*  On March 27, 2021, Steve McKee, M.D., reconsidered the evidence of Vickroy's RFC and generally affirmed Kylop's findings, but found that Vickroy should avoid concentrated exposure to extreme cold; extreme heat; humidity; and fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. 121-122).

#### b.    Mental Health Consultants

On October 5, 2020, Jennifer Swain[4] reviewed the medical evidence of Vickroy's mental health limitations.  (Tr. 102-103).  As to Vickroy's ability to sustain his concentration and persistence, Swain concluded that Vickroy either was not significantly limited or had no evidence of limitation.  (Tr. 102).  Socially, she concluded that Vickroy was moderately limited in his ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to supervisors' criticism, and in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  *Id.*  He otherwise was not significantly limited.  *Id.*  Swain also found that Vickroy was moderately limited in his ability to respond appropriately to work-setting changes but was otherwise not significantly limited.

---

[3] The agency's decision does not indicate what, if any, specialty degree, Kylop has obtained, but it designated him with a medical specialty code for physical medicine.  (Tr. 102).

[4] The agency's decision does not indicate what, if any, specialized degree Swain has obtained, but it has designated her with a medical specialty code for psychology.  (Tr. 103).

(Tr. 103). On January 20, 2021, Aracelis Rivera, Psy.D., reviewed the medical evidence of Vickroy's mental health limitations and affirmed Swain's findings. (Tr. 122-123).

### D.    Relevant Testimonial Evidence

#### 1.    Jeffrey Vickroy

Vickroy testified at the hearing. (Tr. 39-86). He indicated that he had lost two inches in his back. (Tr. 49-52). He had a driver's license and could drive, but did not currently have a vehicle. (Tr. 53). He also had agoraphobia, and, when his anxiety flared-up, his blood pressure would increase as well. *Id.* He completed high school and then entered the Army. (Tr. 54). His left arm would go numb when he would write, so it was not legible. *Id.* He had previously received disability from the VA for his "health issues," referencing his PTSD, OSA, knee pain, and social anxiety/agoraphobia. (Tr. 56-57).

Vickroy testified that he had previously worked as a corrections officer and then in a foundry and as a maintenance worker. (Tr. 58). He believed he could no longer work because his breathing was bad, due to his COPD and asthma; he had agoraphobia and anxiety; and his blood pressure was an issue. (Tr. 67-68). He had trouble climbing ladders, his left arm was numb "95%" of the time, he had issues gripping things, he could only work for about 10 to 20 minutes before needing to sit and rest, and he suspected he had ADHD because of his issues focusing. (Tr. 68). "The biggest problem," Vickroy testified, was that he did not get along with people, which would stress him out and create blood pressure issues. *Id.* He also indicated he had issues with his back, which impacted his ability to lift, move, and crawl, such that, if he were on the floor, he could not get up without assistance. *Id.* He also had pain when climbing stairs. *Id.*

Vickroy testified that, as to his breathing, he had been on two inhalers, and a CPAP machine that administered albuterol liquid, which he used at varying frequencies.  (Tr. 69-71). He did not like his CPAP mask because he would frequently break it in his sleep.  (Tr. 70-71). Vickroy also testified that, as to his agoraphobia and anxiety, he was seeing a new doctor who prescribed anxiety medication, which he was to take when stressed.  (Tr. 71)*.*  He was trying to start counseling, and he had been seeing a private counselor the previous fall and winter. (Tr. 73-74).  Since 2006 or 2007, he had also been using cannabis on an almost daily basis to help with his anxiety.  (Tr. 75-76).  His anxiety affected his ability to concentrate.  (Tr. 83).  If he was cooking, he would lose track of where he was and burn things, or he would leave his tools running without shutting them off or forget his laundry.  (Tr. 83-84).  As to his numbness, Vickroy testified that his understanding was that it was due to his neck, and he was given stretching exercises, but he had not received any other treatment for it.  (Tr. 77-78).

Vickroy testified that he could lift about 20 to 30 pounds, but his back, knee, and neck pain prevented him from lifting more or crawling.  (Tr. 78-79).  If he used his hands too long or lifted too much, he would have headaches.  (Tr. 86).  He also struggled to lower himself and needed assistance when standing up because of his lack of strength and stamina.  (Tr. 79).  He believed he could stand for 10 to 20 minutes before needing to sit down.  (Tr. 85).  Vickroy testified that he spent his days playing Xbox, drawing, or tinkering.  (Tr. 79).

### 2.    Vocational Expert

A vocational expert ("VE")  also testified at the administrative hearing, stating that if the claimant was "unable to interact with their supervisor for at least two-thirds of the workday," which he interpreted to mean that they are "not able to have a relationship with the supervisor

that [would] allow him to be able to teach them actively," such a situation would usually result in termination.  (Tr. 93-94).

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion.  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant.  *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.    Step Two: Severe Impairment Analysis

Vickroy contends that the ALJ erred in failing to find that his upper extremity numbness was a severe impairment.  ECF Doc. 7 at 8-10.  The Commissioner disagrees, adding that because the ALJ discussed Vickroy's numbness in the remaining steps of the sequential evaluation process any alleged error at Step Two would be harmless.  ECF Doc. 9 at 9-11.

At Step Two, a claimant has the burden to show that he has *at least one* "severe impairment."  20 C.F.R. § 404.1520(a)(4)(ii), (c).  A "severe impairment" is a medical condition

that has more than minimal effect on mental or physical function and is expected to last for 12 months or cause death.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show he has *at least one* "severe" impairment, he is categorically *not* disabled.  20 C.F.R. § 404.1520(c).  If he does satisfy this minimal burden, the ALJ has to consider *all of his impairments* (even ones that aren't "severe") at the remaining steps in the sequential evaluation process.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ applied the correct legal standard and reached a decision supported by substantial evidence, or harmlessly erred in doing so, in evaluating Vickroy's left-arm numbness.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakley*, 581 F.3d at 405.  The record evidence does not support Vickroy's contention that his upper extremity numbness would last for a year or more or could cause death.  Aside from his own subjective complaints, the medical evidence supports only one instance in which Vickroy reported numbness – in his right leg.  (Tr. 383).  And even by his own admission, he believed the numbness was due to his neck and he was given conservative treatment, in the form of stretches.  (*See* Tr. 77-78).  As a result, the ALJ's conclusion that Vickroy had not demonstrated that his purported upper extremity numbness had more than a minimal effect on his abilities, was not erroneous.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi*, 744 F.2d at 691.

Even if the ALJ should have included arm numbness as a severe impairment, however, the ALJ's alleged error would be harmless in light of the ALJ's subsequent discussion of Vickroy's upper extremity limitations.  *Nejat*, 359 F. App'x at 577.  It is important here to clarify that, although Vickroy frames the Step Two error as a failure to include upper extremity numbness, Vickroy's argument has not pointed to any specific medical evidence discussing arm numbness.  ECF Doc. 7 at 9-10.  Instead, Vickroy cites evidence of manipulative limitations, problems focusing because of his pain, and issues with his grip strength and triggering migraines. *Id.*  Consequently, as to the substance of Vickroy's argument, I find that the ALJ's Step Two finding was, at most, harmless because – as Vickroy acknowledges – the ALJ discussed all of those limitations/impairments.  ECF Doc. 7 at 9-10; *see also* (Tr. 24-26).  Because the ALJ discussed the substance of Vickroy's argument, the only possible omission would be that the ALJ failed to specifically acknowledge Vickroy's testimony that he had upper extremity numbness.  But this alone is insufficient to warrant remand because of the ALJ's alternative discussion of those other conditions, which Vickroy attribute to his numbness, such as his purported manipulative limitations.  *See Friend v. Comm'r*, 375 F. App'x 543, 551 (6th Cir. 2010) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004)) (noting that the failure to strictly comply with the agency's legal procedures may be harmless when the ALJ met the goal of the procedural safeguards, despite failing to strictly comply with the regulations."); *see also Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." (Citations omitted)).  Moreover, the ALJ's RFC findings included a limitation on Vickroy's ability to use his left upper extremity,

thereby accommodating the difficulties Vickroy experienced with that arm.  Accordingly, I recommend that Vickroy's argument concerning the ALJ's Step Two finding be rejected.

### C.    Step Four: Subjective Symptom Complaints

Vickroy contends that the ALJ erred in the evaluation of his subjective symptom complaints, particularly his pain and numbness.  ECF Doc. 7 at 10-14.  Vickroy also argues the ALJ failed to give specific reasons for finding his complaints inconsistent and/or unsupported by the record.  *Id.* at 15-16.  Tacked on to Vickroy's summary of the opinion evidence, he stated that "[w]hen the vocational witness was asked the effect of a person only being able to interact with a supervisor on an occasional basis, it was opinioned that [such] would result in termination."  *Id.* at 13.

The Commissioner disagrees.  ECF Doc. 9 at 18-21.  Additionally, the Commissioner contends that Vickroy mischaracterizes the vocational expert's testimony in asserting that the VE testified that only occasional interaction with a supervisor would result in a disability finding.  ECF Doc. 9 at 21-23.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing a claimant's RFC at Step Four of the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Generally, an ALJ must explain whether she finds the claimant's subjective complaints consistent with objective medical evidence and other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017); *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (The ALJ must clearly explain her reasons for discounting subjective complaints).  In conducting this analysis, the ALJ may consider several factors, including claimant's efforts to alleviate his

symptoms, whether any treatment was effective, and any other factors concerning the claimant's functional limitations and restrictions.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).  The regulations don't require the ALJ to discuss each factor or each piece of evidence, but only to acknowledge the factors and discuss the evidence that supports her decision.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each [factor], so long as he acknowledged and examined those [factors] before discounting a claimant's subjective complaints." (quotation omitted)); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'[A]n ALJ is not required to discuss all the evidence submitted.'" (quoting *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)).

The ALJ applied the correct legal standards and reached a decision supported by substantial evidence in finding that Vickroy's subjective symptom complaints were not supported by the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakley*, 581 F.3d at 405.  The ALJ acknowledged her obligations under SSR 16-3p in the review of Vickroy's subjective complaints.  (Tr. 23).  The ALJ also reviewed Vickroy's physical and mental health-related complaints, interspersed with her review of the medical evidence.  (Tr. 23-27).  After noting both Vickroy's complaints and the medical evidence, however, the ALJ made clear statements indicating that she found that the medical evidence and Vickroy's own daily activities were not fully consistent with his complaints.  (Tr. 25-27).

Reading the ALJ's analysis with common sense, the ALJ made sufficient findings and adequately articulated her reasons for rejecting Vickroy's complaints.  See *Buckhanon ex rel.*

21

*J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common sense.").  Regarding Vickroy's physical conditions, the ALJ outlined that: (i) objective evidence conflicted with Vickroy's allegations of weakness and his alleged inability to stand or walk; (ii) imaging showed only mild limitations; (iii) there was a lack of objective evidence showing upper extremity radiculopathy or manipulative limitations; (iv) there were no records of significant respiratory symptoms or complications and pulmonary testing did not indicate significant limitations; and (v) Vickroy's ability to play and enjoy artistic endeavors were inconsistent with his manipulative complaints.  (Tr. 25-26).  Similarly, as to Vickroy's mental health complaints, the ALJ identified that: (i) Vickroy did not seek consistent treatment until May 2021; (ii) his mental status examinations were generally normal; and (iii) Vickroy's playing of videogames, driving, and art projects generally indicated at least some intact ability to concentrate.  (Tr. 26-27).  In light of this substantive discussion and explanation of the ALJ's reasoning, the ALJ fully satisfied her articulation obligations under the regulations. SSR 16-3p, 2016 SSR LEXIS 4 *15; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Renstrom*, 680 F.3d at 1067.

Moreover, independent review of the record show that the ALJ's conclusions were supported by substantial evidence.  *See Blakley*, 581 F.3d at 406.  As to Vickroy's physical complaints, such evidence includes: (i) Vickroy's generally normal physical examinations, or lack of any notations by the mental health treatment providers (*see* Tr. 386, 395, 559-560, 612-613); (ii) evidence of only mild impairment from his spine (*see* Tr. 380, 385-386, 565-566); (iii) the lack of any medical evidence of manipulative limitations; (iv) the lack of evidence of significant respiratory treatment or concerns (*see* Tr. 557-560, 633-634; (v) a finding of only mild obstructive breathing issues with his pulmonary test (*see* Tr. 566-573); and (vi) findings of

only moderate knee pain (*see* Tr. 369-372).  *See Blakley*, 581 F.3d at 406.  As to Vickroy's

mental health complaints, such evidence includes: (i) Vickroy's generally normal mental status

examinations (*see* Tr. 468-472, 550-552, 609), (ii) treatment notes and opinions indicated he had

only moderate limitations at best (*see* Tr. 102-103, 122-123, 471-472, 550-552); (iii) Vickroy's

general lack of mental health treatment; and (iv) Vickroy's ability to play video games for hours,

drive, and do art projects (*see* Tr. 53, 79, 317-318, 361).  *See Blakley*, 581 F.3d at 406.

As to Vickroy's passing assertion regarding the VE's testimony, Vickroy's interpretation

of the VE's testimony is inaccurate.  (*See* Tr. 93-94).  The VE's testimony was based on a

hypothetical in which the individual could not occasionally interact rather than Vickroy's

reference to "only being able to interact" on an occasional basis.  *Id.*  Regardless, based on the

discussion above, the ALJ's evaluation of Vickroy's subjective symptom complaints was

supported by substantial evidence and, thus, we need not analyze the impact that accepting

Vickroy's complaints might have had.  The ALJ's analysis of Vickroy's subjective symptom

complaints applied the correct legal standards and was supported by substantial evidence.  I

recommend that Vickroy's challenge to ALJ's decision on this ground be overruled.

### D.    Step Four: Residual Functional Capacity

Vickroy contends that the ALJ erred in finding he could perform medium exertional level

work.  ECF Doc. 7 at 16-17.  In support, Vickroy challenges the ALJ's treatment of the evidence

of his pain and the weighing of the medical opinions.  ECF Doc. 7 at 17-18.

The Commissioner disagrees, contending that the ALJ's RFC and, in particular, his

finding that Vickroy was limited to medium exertional work, was supported by substantial

evidence and that the court should not read Vickroy's contentions regarding the medical opinions

as a stand-alone argument against them.  ECF Doc. 9 at 12-17.

23

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e), 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and the claimant's statements about how the symptoms affect him.  20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Under the regulations, medium work is defined as "involv[ing] lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c), 416.967(c).  SSR 83-10 adds further explanation to the exertional level:

> A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.  As in light work, sitting may occur intermittently during the remaining time.  Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.  The considerable lifting required for the full range of medium work usually requires frequent bending-stooping . . . .  Flexibility of the knees as well as the torso is important for this activity. . .

SSR 83-10, 1983 SSR LEXIS 30.

The ALJ applied the correct legal standards and reached a conclusion supported by substantial evidence in determining that Vickroy could perform medium-level exertional work.  42 U.S.C. §§ 405(g), 1383(c)(3); *Blakley*, 581 F.3d at 405.  Vickroy's challenge to the ALJ's finding rests on the ALJ's rejection of the state agency consultants' opinions, the acceptance of portions of Dr. Kranysansky's opinion, and x-rays of Vickroy's knees.  ECF Doc. 7 at 16-18.  As

24

to the medical opinions, Vickroy, at best, makes only passing remarks to the ALJ's weighing of the medical opinions. ECF Doc. 7 at 17-18. Because Vickroy's contention lacks a substantive argument challenging the ALJ's analysis and weighing of the medical opinions, I consider the argument inadequately developed and forfeited or waived. *See Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010) (affirming a district court's finding that a claimant waived arguments that he did not raise in his merits brief).

However, even if not waived, the ALJ applied the correct legal standards in evaluating the opinions because the ALJ articulated the reasons for finding each opinion unpersuasive or "somewhat persuasive." 20 C.F.R. § 404.1520c(a) (in determining a claimant's RFC and evaluating the medical opinions, the ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings."). In doing so, at minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2)[5]. As to the state agency consultants, the ALJ explained that their findings were inconsistent with the imaging evidence, which generally showed only "mild" abnormalities, and that Vickroy routinely exhibited a normal physical abilities; nor did the consultants provide an adequate explanation of the lifting/carrying limitation. (Tr. 27-28). As to Dr. Krasnyansky's opinion, the ALJ likewise explained why she found it "somewhat persuasive," noting that it was supported by a contemporaneous physical examination and pulmonary function test, but was inconsistent with Vickroy's other medically determinable impairments. (Tr. 28). Consequently, the ALJ complied

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

with the regulations by discussing both the supportability and consistency of the opinions.  20 C.F.R. § 404.1520c(b)(2).

Returning to the ALJ's RFC, Vickroy's challenge appears premised on the contention that the sole basis for the ALJ's conclusion was Dr. Kranysansky's opinion.  ECF Doc. 7 at 18. This ignores the host of other medical evidence and analysis the ALJ performed.  The ALJ's decision demonstrates that she considered Vickroy's subjective complaints, the medical opinions, and the medical evidence.  (*See* Tr. 23-29).  Further, Vickroy does not identify any particular evidence the ALJ allegedly failed to consider, limiting his challenge to the ALJ's weighing of the evidence.  ECF Doc. 7 at 16-18.  Even to the extent Vickroy references his knee x-rays, the ALJ's summary of the medical evidence mentioned the x-rays and the degenerative changes they demonstrated.  (*See* Tr. 24 citing 544).  And the court may not review how the ALJ weighed specific evidence.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

Moreover, the ALJ's finding was supported by substantive evidence, including: (i) the lack of any treatment notes indicated manipulative limitations; (ii) treatment notes indicating only minimal spinal impairment (*see* Tr. 380, 385-386, 388, 565-566); (iii) treatment notes indicating only mild bilateral knee pain (*see* Tr. 370-372, 369); (iv) the state agency consultants finding that Vickroy could stand, walk, or sit for 6 hours in an 8-hour work day (*see* Tr. 101, 121-122); (v) the medical opinion evidence that Vickroy had no functional limitations (*see* Tr. 560); and (vi) Vickroy's generally normal physical examinations (*see* Tr. 385-386, 559-560, 395, 611-612).  *See Blakley*, 581 F.3d at 406.  Based on this evidence, the ALJ's decision was supported by substantial evidence and fell within her "zone of choice;" accordingly, it should be affirmed.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Vickroy's applications for DIB and SSI be affirmed.

Dated: August 3, 2023

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).